UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NATHAN ROWAN, individually, and on behalf
of all others similarly situated,

                Plaintiff,

    v.

BROCK PIERCE, an individual,

                Defendant.

No. 3:20-cv-01648-RAM

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

The Court should deny Brock Pierce's motion to dismiss in total.

First, Plaintiff sufficiently alleges standing to pursue a claim under the Telephone Consumer Protection Act's prerecorded voice calls provision (47 U.S.C. § 227(b)(1)(A)(iii)) by alleging that the prerecorded political campaign call he received on his personal cellular phone caused the precise types of harms Congress enacted the TCPA to prevent—invasion of privacy and nuisance.

Second, Plaintiff sufficiently alleges Pierce's liability for the prerecorded political campaign call he received, and that, as a result, Plaintiff's injuries from the call are traceable to Pierce's conduct, by sufficiently alleging that Pierce either personally placed the call or, alternatively, was so heavily involved in the calls that he can either be deemed to have initiated it or is liable under control based, vicarious, and alter ego theories of liability.  Specifically, with regard to each theory, Plaintiff alleges that Pierce controlled the content of the campaign's prerecorded messages, recorded the messages himself, identified himself in the messages, determined to whom the messages would be transmitted, paid for the messages, and otherwise knew about and expressly authorized the transmission of the messages for his own personal benefit as a candidate for President.

Ultimately, Plaintiff's allegations are sufficient to put Pierce on notice of Plaintiff's claims and to commence discovery.

## PLAINTIFF'S ALLEGATIONS

As the Supreme Court recently explained in a case brought by political organizations that wanted to make political prerecorded calls to cellular telephone numbers, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (U.S. July 6, 2020). First Amended Complaint (ECF 35) at ¶ 5.

Since 1991, that fight has taken the form of the Telephone Consumer Protection Act. Under the TCPA, "Political campaign-related autodialed or prerecorded voice calls, including autodialed live calls, autodialed texts, and prerecorded voice messages, are prohibited to cell phones, pagers or other mobile devices *without the called party's prior express consent*."[1] *Id*. at ¶ 14. Additionally, all "campaign-related" prerecorded voice messages, "at the beginning," "must include certain identification information," including the "identity of the business, individual, or other entity initiating the call."[2] *Id*. at ¶ 15.

These restrictions are necessary because the FCC has found that "During election seasons, consumers will likely experience an increase in calls and texts from political campaign."[3] *Id*. at ¶ 16. In fact, "Every year around Election Day … the Monday before Election Day was the highest day on record for receiving robocalls."[4] *Id*. at ¶ 17. In 2020, because of early voting and the pandemic, the ramp up in political robocalls extended even longer, from August until election day.[5] *Id*. at ¶ 18.

---

[1] https://www.fcc.gov/rules-political-campaign-calls-and-texts
[2] *Id*.
[3] *Id*.
[4]    https://www.wrcbtv.com/story/42706718/political-robocalls-blowing-up-phones-across-the-nation-ahead-of-election-day
[5]    https://www.fayobserver.com/story/news/2020/11/24/robocalls-analysis-nc-got-nations-most-election-day-political-phone-calls-tns-tnsi-vote-spam-calls/6386812002/

Brock Pierce was a 2020 candidate for President of the United States.[6] *Id*. at ¶ 19. Pierce was running as an Independent.[7] *Id*. at ¶ 20. In order to promote himself for the election, Pierce placed pre-recorded calls to consumers' cellular telephone numbers without first obtaining their prior express consent. *Id*. at ¶ 21.

The pre-recorded messages were recorded by Pierce with his own voice. *Id*. at ¶ 22. Pierce recorded different pre-recorded messages for different states. *Id*. at ¶ 23. For example, for New York, underscoring his knowledge that he was recording a voice message to be transmitted to consumers' cellular telephones, Pierce (who resides in Puerto Rico) quips "I've had a New York number for nearly 20 [years]." *Id*. at ¶ 24.

As required by the FCC regulations, at the beginning, all of the prerecorded messages specifically identified "Brock Pierce" as the person initiating the calls. *Id*. at ¶ 25. No other person or entity is identified at any other point during the prerecorded messages. *Id*. at ¶ 26.

Pierce either drafted or had the authority to revise the call scripts and therefore personally controlled the content of the prerecorded calls. *Id*. at ¶ 27. In fact, the call scripts specifically referenced Pierce's own personal relationship to each state for which a message was recorded. *Id*. at ¶ 28.

Pierce also determined or had the authority to determine to whom the calls would be made, at a minimum, by recording messages that identified the different states to which they would be transmitted. *Id*. at ¶ 29. Additionally, either directly or indirectly, Pierce collected voters lists to gather phone numbers that he could send out pre-recorded voice messages promoting himself for the election. *Id*. at ¶ 36.

Given that Pierce himself recorded the messages, Pierce was or should have been aware that prerecorded voice messages were being transmitted promoting his presidential candidacy. *Id*. at ¶ 30. Notwithstanding, Pierce either expressly authorized the calls or, at a minimum, never

---

[6] https://www.linkedin.com/in/brockpierce/
[7] https://www.brock.vote/agenda

objected to the making of prerecorded voice calls or repudiated the calls that were obviously for his own personal benefit as a presidential candidate. *Id.* at ¶ 31.

To the extent the prerecorded messages were sent by Pierce's presidential campaign, in addition to the above, Pierce was heavily involved in the means and manner by which the campaign promoted his candidacy, and the campaign was otherwise his alter ego and beholden to him. *Id.* at ¶ 32. For example, Pierce has stated that he personally controlled the tone of his campaign's public messaging in making clear that "This is a very serious campaign. Our campaign is very serious. … I refuse to run a negative campaign." *Id.* at ¶ 33.

Moreover, the campaign was inadequately capitalized and subject to Pierce's control because $5,928,676.44 of its $6,345,535.87 in operating expenditure were funded by a loan from Pierce to the campaign, and the campaign's balance sheet presently reflects loan liability against only $17,538.70 in assets.[8] *Id.* at ¶ 34. As Pierce himself explained it, "I spent $6m, ***personally***.[9] This first run was the exploratory mission to understand the mechanics of running a national campaign without the infrastructure of a major existing political party. Let's just say, my basic training is completed, an expensive education and a very risky one."[10] *Id.* at ¶ 35.

Many consumers have voiced their complaints online about receiving these unsolicited prerecorded messages from Pierce:

- "Robocall from Brock Pierce. How did he get my number?"[11]

- "This is a robocall recording of Brock Pierce for President. Calling back the number leads to another recording for him. Political robocall is really pathetic and stupid."[12]

- "Recorded message asking for a vote."[13]

---

[8] https://www.fec.gov/data/candidate/P00016550/
[9] Emphases supplied throughout this response.
[10]          https://www.thenationalnews.com/business/money/money-me-i-was-a-child-star-in-hollywood-but-now-i-m-a-cryptocurrency-billionaire-1.1242361
[11] https://findwhocallsyou.com/2086448751?CallerInfo#Done
[12] https://www.everycaller.com/phone-number/1-845-447-9504/
[13] Id.

*Id*. at ¶ 41. The website RoboKiller.com tracks and lists phone numbers which have called its userbase. Robokiller.com lists that the 845-447-9504 (the same phone number which left a prerecorded voicemail on Plaintiff's phone) called at least 3,944 other users who use Robokiller.com, of which 12 users reported the call, and one user uploaded the same prerecorded call that Plaintiff received from the same phone number 845-447-9504:



Listen

▶ 0:00 / 0:29 ━━━━━━━━━━━━━━━━━━━━━━━━━━ 🔊 ⋮

Transcription

hi this is Brock Pierce I've lived in New York for years I've had a New York number for nearly 20 and I'm running for president of the United States of America as an independent candidate I've been endorsed by the independence party of New York this country is divided right now divided politically divided economically divided racially we have to solve these problems we have to find our way back to Unity you can learn more at www.breckwell.com ⚑

[14]

*Id*. at ¶ 42.

Pierce made similar prerecorded calls to other consumers in states across the country. *Id*. at ¶ 43. For example, other consumers reported on websites like NoMoRobo.com that they received similar prerecorded messages directed to them in their state, a few days before the Plaintiff received his prerecorded call. *Id*. at ¶ 44. Below is a copy of a prerecorded call from Pierce directed to individuals in Idaho and another prerecorded call directed to individuals in Utah.



**(208) 644-8751** is a Political Robocall

LISTEN   ▶ 0:00 ━━━━━━━━━━━━━━━━━━━━━━━━━━ 🔊

TRANSCRIPT   *I've been to Idaho multiple times on the campaign trail I even brought my daughter and I'm here to let you know that I will defend your constitutional rights your right to life liberty and the pursuit of happiness I'm Brock Pierce and I'm running for president of the United States of America as an independent candidate you can learn more at w w w dot Brock dot vote remember to vote to vote your conscience a vote for me is a vote for our future God bless.*

DATE BLOCKED   October 27, 2020

[15]

---

[14] https://lookup.robokiller.com/p/845-447-9504
[15] https://www.nomorobo.com/lookup/208-644-8751

CALL ACTIVITY     Low     **Last detected 5 days ago**

[16] *Id*.

Each of these prerecorded calls were recorded by Pierce himself to be disseminated to individuals in a similar way without their prior express consent to receive such calls from Pierce. *Id*. at ¶ 45.

On October 29, 2020, Plaintiff Rowan received a call from, or on behalf of Pierce from the phone number 845-447-9504 at 12:37 PM to his cell phone. *Id*. at ¶ 46. The call rang once and then went to Plaintiff's voicemail. *Id*. at ¶ 47.

A pre-recorded voice message from Pierce was left on Plaintiff's cell phone voicemail stating:

> "Hi, This is Brock Pierce. I've lived in New York for years. I've had a New York number for nearly 20. And I'm running for President of the United States of America as an independent candidate. I've been endorsed by the Independence Party of New York. This country is divided right now. Divided politically, divided economically, divided racially. We have to solve these problems; we have to find our way back to unity. You can learn more at www.brock.vote. Remember to vote. Remember to vote your conscience. A vote for me is a vote for change. It's a vote for our future."

*Id*. at ¶ 48. Pierce knowingly recorded this prerecorded message to be distributed through a prerecorded call to individuals in New York. *Id*. at ¶ 49.

Plaintiff Rowan has never provided his cell phone number to Pierce or Pierce's campaign, let alone providing his express consent to received prerecorded calls from him. *Id*. at ¶ 50. The unauthorized telephone calls that Plaintiff received from or on behalf of Pierce, as alleged herein, has harmed Plaintiff Rowan in the form of annoyance, nuisance, and invasion of privacy, consumed his phone line, and disturbed the use and enjoyment of his phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on the phone and his voicemail. *Id*. at ¶ 51.

---

[16] https://nomorobo.com/lookup/385-218-6198

Seeking redress for these injuries, Plaintiff Rowan, on behalf of himself and Class of similarly situated individuals, who received Pierce's unsolicited, pre-recorded campaign-related voice message calls to their cellular telephone numbers. *Id*. at ¶ 52.

## ARGUMENT

### 1. Plaintiff Sufficiently Alleges Standing

The Article III requirement that plaintiffs demonstrate standing to sue is meant "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest". *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Congress passed the TCPA to protect consumers from intrusive and unwanted calls. *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013) (citing *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012)).

Every court of appeals to address the question post-*Spokeo* has found that the TCPA elevated harms to legally cognizable injuries such that Article III standing is established if plaintiffs allege a statutory violation of a procedure designed to protect against the harm the statute was designed to prevent. *See, e.g., Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 959 (8th Cir. 2019) ("An alleged harm need not actually have been actionable at common law to satisfy this inquiry, rather it must have a 'close relationship' to the type of harm that has traditionally been recognized as actionable."); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) ("A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'"); *Susinno v. Work Out World Inc.*, 862 F.3d 346 (3d Cir. 2017) (holding receipt of a single missed call resulting in a prerecorded voicemail to be sufficiently concrete injury, noting similarity to intrusion upon seclusion tort); *Carl v. First Nat'l Bank*, No. 2:19-cv-00504-GZS, 2021 U.S. Dist. LEXIS 111889, at *16 (D. Me. June 15, 2021) (citing *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462-63 (7th Cir. 2020) (Barrett, J.); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d

Cir. 2019)). This is because, as the *Susinno* court explained, "Congress was not inventing a new theory of injury when it enacted the TCPA" but instead "elevated a harm that, while 'previously inadequate in law,' was of the same character of previously existing 'legally cognizable injuries.'" 862 F.3d at 352 (citing *Spokeo*, 126 S. Ct. at 1549).

Therefore, a TCPA plaintiff sufficiently alleges an injury-in-fact by alleging that he received a TCPA violative call that interfered with the use and enjoyment of his cellular phone service and annoyed him. *E.g., Laccinole v. U.S. Veterans Assistance Found., Inc.*, No. 21-160 WES, 2021 U.S. Dist. LEXIS 141581, at *3 (D.R.I. July 29, 2021) ("Plaintiff's Complaint easily vaults the *Spokeo* bar."); *Katz v. Liberty Power Corp., LLC*, No. 1:18-cv-10506-ADB, 2019 U.S. Dist. LEXIS 162793, at *35 (D. Mass. Sep. 24, 2019) ("[A] mere technical violation of the TCPA is, by itself, a concrete injury sufficient to confer standing.") (quoting *Gibbs v. SolarCity Corp*., 239 F. Supp. 3d 391, 395 (D. Mass. 2017)). And this is precisely what Plaintiff Rowan alleges here—that the "unauthorized" prerecorded call he received to his cell phone from Pierce "harmed [him] in the form of annoyance, nuisance, and invasion of privacy, consumed his phone line, and disturbed the use and enjoyment of his phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on the phone and his voicemail."  First Amended Complaint at ¶ 51.

There is no dispute that the Plaintiff received a prerecorded call that he did not consent to. The alleged violation, then, caused the precise harms the TCPA was designed to prevent. *Susinno*, 862 F.3d at 348 (prerecorded call that lasted approximately one minute sufficient for purposes of Article III standing); *Golan*, 930 F.3d at 952 (prerecorded call the entirety of which stated "Liberty. This was a public survey call. We may call back later." was enough to establish Article III standing). Such violations – like here – and their close relationship to invasion of privacy and intrusion upon seclusion are, at minimum, an "identifiable trifle" sufficient for purposes of Article III.

The case law Pierce cites in its motion fails to persuade otherwise. *Grigorian* concerned a single voicemail drop (i.e., a message transmitted directly to a phone's voicemail without the

phone ringing), which the Eleventh Circuit likened to a single text message. *Grigorian v. FCA US Ltd. Liab. Co.*, No. 19-15026, 2020 U.S. App. LEXIS 38370, at *8 (11th Cir. Dec. 9, 2020) (holding that plaintiff lacked standing to pursue a TCPA claim based on a single voicemail drop, because, like a text message, but unlike a typical call, a voicemail drop does not "render… her phone unavailable to receive legitimate calls or messages for any period of time"). As a result, the Eleventh Circuit applied its prior limited standing analysis concerning a plaintiff's receipt of a single TCPA violative text message. *Id.; see Salcedo v. Hanna*, 936 F.3d 1162, 1173-74 (11th Cir. 2019) (Judge Prior clarified in the concurring opinion that she considered the opinion to be limited to circumstances involving the receipt of a single text message); *cf. Carl*, 2021 U.S. Dist. LEXIS 111889, at *17 ("*Salcedo* can be readily distinguished"); *Cunningham v. Radius Glob. Sols. LLC*, No. 4:20-CV-00294, 2020 U.S. Dist. LEXIS 167954, at *9 (E.D. Tex. Sep. 14, 2020) ("The facts here are distinguishable. At issue in this case is a missed call, not a single, unsolicited text message.").

At issue here, however, is neither a voicemail drop nor a text message, but an unwanted missed call resulting in a prerecorded voicemail (*see* First Amended Complaint at ¶¶ 46-48), which alone is sufficient to distinguish *Grigorian* and *Salcedo* and align this case with all others finding that a prerecorded call *does* confer Article III standing on the recipient. Helpfully, however, the Eleventh Circuit subsequently clarified this point by distinguishing *Salcedo* with *Susinno*, which addressed a single missed call resulting in a prerecorded voicemail (like this case): "For these reasons, the Third Circuit held…that the receipt of a single unsolicited call to a cell phone and a voicemail recording constituted an injury in fact. [citing *Susinno*]… There, the court explained that 'Congress squarely identified this injury' in the TCPA and that this harm bore a close relationship to the kind of harm that would have given rise to the common law cause of action of 'intrusion upon seclusion.'…**We agree**…This Court's recent decision in [*Salcedo*], that the receipt of a single unsolicited text message does not qualify as an injury in fact does not change our analysis…." *Cordoba*, 942 F.3d at 1270; *see also Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 998-99 (11th Cir. 2020) ("Although the statute has been understood to apply to both telephone

calls and text messages, the TCPA's statutory findings highlight the burden imposed by unwanted calls but say nothing about unwanted texts. In part, this Court relied on those findings in holding that the receipt of unwanted phone calls is a concrete injury, *Cordoba ...*, but the receipt of a single unwanted text message is not, *Salcedo* ....").

In fact, the exact standing argument Pierce makes has been rejected by multiple Eleventh Circuit district courts, both before and after the Eleventh Circuit's unpublished and otherwise factually limited *Grigorian* opinion.  For example, in *Fischer v. Trivita Inc.*, No. 6:19-cv-2333, ECF No. 105 at *7 (M.D. Fla. July 30, 2020), the court determined, "Indeed, in *Salcedo*, the court 'expressly distinguished receiving a text message from receiving an unwanted phone call.' *Id.* (citing *Salcedo*, 936 F.3d at 1172). Given the differences between text messages and phone calls described by the Eleventh Circuit, along with the Eleventh Circuit's express agreement with *Susinno*, the Court concludes that Plaintiff, in stating he received a single unlawful phone call, has alleged that he has suffered an injury that is sufficiently concrete to establish Article III standing." *Id.*; *see also Abramson v. Fed. Ins. Co.*, No. 8:19-cv-2523-T-60AAS, 2021 U.S. Dist. LEXIS 15172, at *5 (M.D. Fla. Jan. 27, 2021) ("Plaintiff has presented sufficient facts to confer Article III standing. Plaintiff alleges that he received an unsolicited phone call with a pre-recorded message. He further alleges that he and other call recipients were harmed by these calls because they were temporarily deprived of legitimate use of their phones and their privacy was improperly invaded. '[R]eceipt of a single unsolicited phone call... and a voicemail recording constitute[s] an injury in fact' for the purposes of standing.").

And the analysis of Plaintiff's standing is not otherwise altered by the fact that he has filed previous TCPA actions. To enforce the TCPA, Congress empowered consumers with a private right of action and incentivized consumers to enforce the TCPA by establishing statutory damages for each violation. *See* 47 U.S.C. § 227(b)(3) (Congress creates a private right of action for unsolicited prerecorded calls to cellular telephone numbers and provides for statutory damages of $500 for a negligent violation and $1,500 for a knowing or willful violation). "The statutory damages available under the TCPA are, in fact, specifically designed to appeal to plaintiffs' self-

interest and to direct that self-interest toward the public good: like statutory compensation for whistleblowers, they operate as bounties, increasing the incentives for private enforcement of law. Designing a cause of action with the purpose of enlisting the public in a law's enforcement scheme is a well-established tool that can be found in areas ranging from antitrust and civil rights law to environmental law and false claims. While these schemes do not eliminate the constitutional requirement of an injury-in-fact, neither do they impose an additional hurdle simply because the plaintiff may have a motive beyond mere compensation for his injury." *Mey v. Castle Law Grp., PC*, No. 5:19-CV-185, 2020 U.S. Dist. LEXIS 174894, at *6-7 (N.D.W. Va. Sep. 22, 2020).

Here, Plaintiff alleges that Pierce's prerecorded call caused him the precise injuries the TCPA was intended to prevent (*see* First Amended Complaint at ¶ 5), and there is no evidence or other basis to conclude at this stage (other than Pierce's insinuation) that Plaintiff Rowan maintained the number Pierce called solely for "attracting … calls to support his TCPA lawsuits" as would be required to take him out of the TCPA's zone of interest. *See, e.g., Katz*, 2019 U.S. Dist. LEXIS 162793, at *30; *cf. Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 788-89 (W.D. Pa. 2016), in which, at summary judgment, a TCPA plaintiff was found to lack standing where she testified her sole purpose for owning over 35 cell phones was to run what she referred to as a TCPA litigation business, and that these 35 cell phones were used only to collect telemarketing calls and were not called by anyone else for any other purpose).

Ultimately, by alleging that the prerecorded call he received occupied his phone line and was otherwise a nuisance to him, as well as a sufficient basis for Pierce's potential liability for the call (*see infra* at §§ 2(a)-(d)), Plaintiff alleges an injury traceable to Pierce that courts have repeatedly determined is sufficient to confer Article III standing. *See, e.g., Cordoba*, 942 F.3d at 1272 ("[E]ven a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement.").

### 2. Plaintiff Sufficiently Alleges Four Independent Bases for Pierce's Liability

The TCPA imposes liability under a variety of theories, including direct liability, control based liability, vicarious liability, and alter ego based liability. At this stage, although Plaintiff is

required to plead only one basis for Pierce's liability for the calls, Plaintiff has sufficiently alleged all four (and as a result, sufficiently alleges that his injury is traceable to Pierce's conduct).[17] *See Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *17-21 (D.N.J. Nov. 20, 2018) (finding that a motion to dismiss should be denied if a plaintiff sufficiently pleads any one of the multiple liability theories alleged in the complaint).

### a. <u>Direct Liability</u>

As Pierce acknowledges, the TCPA provides for direct liability for the party that "***initiates***" a violative call. Motion (ECF 39) at p. 16.  As the FCC has interpreted the term, "a person or entity '***initiates***' a telephone call when it takes the steps necessary to physically place a telephone call" or if they are heavily "involved in the placing of a specific call." *Id*. Relatedly, the FCC requires that all "campaign-related" prerecorded voice messages, "at the beginning," "must include certain identification information," including the "identity of the business, individual, or other entity ***initiating*** the call." FCC Rules for Political Campaign Calls and Texts, available at https://www.fcc.gov/rules-political-campaign-calls-and-texts.

Here, at the beginning of (and throughout the remainder of) the campaign-related prerecorded voice message Plaintiff received, the only business, individual, or entity identified as initiating the call (or otherwise) is "Brock Pierce." First Amended Complaint at ¶ 28. Because it is reasonable to infer that a business, individual, or other entity initiating a political campaign call would comply with the FCC's requirements for making such calls, it is reasonable to infer that "Brock Pierce" ***initiated*** the political campaign call to Plaintiff. This is a sufficient basis for alleging Pierce's direct liability.

But even if Plaintiff were somehow required to do more to plead direct liability and "allege… *facts* showing that Pierce personally decided whether, when, and to whom to send the prerecorded messages at issue" (*see* Motion at p. 17)—Plaintiff does this.

---

[17] "[I]t is generally permissible to pursue alternative theories at the pleading stage." *Cooper v. Charter Communs. Entm'ts I, LLC*, 760 F.3d 103, 112-13 (1st Cir. 2014); *see Diviacchi v. Affinion Grp., Inc.*, No. 14-10283-IT, 2015 U.S. Dist. LEXIS 72353, at *42-43 (D. Mass. Mar. 11, 2015) ("even inconsistent theories").

Plaintiff alleges that the pre-recorded messages were recorded by Pierce with his own voice, and that Pierce recorded different pre-recorded messages for different states. First Amended Complaint at ¶¶ 22-23. For example, for New York, underscoring his knowledge that he was recording a voice message to be transmitted to consumers' cellular telephones, Pierce (who resides in Puerto Rico) quips "I've had a New York number for nearly 20 [years]." *Id.* at ¶ 24.

At the beginning, all of the prerecorded messages specifically identified "Brock Pierce" as the person initiating the calls. *Id.* at ¶ 25. No other person or entity is identified at any other point during the prerecorded messages. *Id.* at ¶ 26.

Pierce either drafted or had the authority to revise the call scripts and therefore personally controlled the content of the prerecorded calls. *Id.* at ¶ 27. In fact, the call scripts specifically referenced Pierce's own personal relationship to each state for which a message was recorded. *Id.* at ¶ 28.

Pierce also determined or had the authority to determine to whom the calls would be made, at a minimum, by recording messages that identified the different states to which they would be transmitted. *Id.* at ¶ 29. Additionally, either directly or indirectly, Pierce collected voters lists to gather phone numbers that he could send out pre-recorded voice messages promoting himself for the election. *Id.* at ¶ 36.

Given that Pierce himself recorded the messages, Pierce was or should have been aware that prerecorded voice messages were being transmitted promoting his presidential candidacy. *Id.* at ¶ 30. Notwithstanding, Pierce either expressly authorized the calls. *Id.* at ¶ 31.

Plaintiff therefore sufficiently alleges that Pierce placed the call to Plaintiff himself or was so involved in placing the call to be deemed to have initiated it.[18]

---

[18] The cases Pierce cites to argue that Plaintiff insufficiently alleges that he initiated the call are wholly irrelevant. *See, e.g., Perrong v. Victory Phones LLC*, No. 20-5317, 2021 U.S. Dist. LEXIS 26159 (E.D. Pa. Feb. 11, 2021) (granting plaintiff leave to amend the complaint to specifically allege that the calls he received were made to a cellular telephone number or other service for which he was charged for the call which was a necessary element of a claim for TCPA violative election calls under 47 U.S.C. 227(b)(1)(A)(iii)); *Wick v. Twilio, Inc.,* No. C16-00914RSL, 2017

###### b.  <u>Control Based Liability</u>

Under the TCPA, an individual such as Pierce, may be personally liable for a TCPA violation under a control based theory pursuant to 47 U.S.C. § 217 of the TCPA, which states:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*.

*See* 47 U.S.C. § 217 (emphasis added).

When considering individual officer liability under the TCPA, courts have agreed that a control person involved in the violations at issue may be personally liable under the TCPA. *See, e.g.*, *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("Many courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (cleaned up)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

"Courts that have addressed the issue have concluded that individuals acting on behalf of a corporation may be held personally liable for violations of Section 227 if they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'" *Jones v. Montachusett Reg'l Transit Auth.*, No. 4:19-cv-11093-TSH, 2020 U.S. Dist. LEXIS 51194, at *9 n.3 (D. Mass. Feb. 7, 2020) (citing *City Select Auto Sales Inc. v. David Randall Assocs., Inc*., 885 F.3d 154, 161 (3rd Cir. 2018); *Universal Elections*, 787 F. Supp. at 415; *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)); *see, e.g., Williams v. Schanck*, No. 5:15-cv-01434-MHH, 2021 U.S. Dist. LEXIS 116218, at *10-11 (N.D. Ala. June 22, 2021)

---

WL 2964855, at *4 (W.D. Wash. July 12, 2017) (the court considered whether a messaging platform could be held liable for providing texting services to a TCPA violator).

("Because the evidence shows that Mr. Schanck personally oversaw and approved of conduct that violated the TCPA, Mr. Schanck is personally liable for Stellar's TCPA violations.").

Here, with regard to Pierce's personal participation in or authorization of the TCPA violative conduct at issue, the same allegations demonstrating he was heavily involved in placing the call such that he could be deemed to have initiated them are sufficient to allege Pierce's liability under a control based theory. Specifically, Pierce controlled the content of the messages, recorded the messages himself, identified himself in the messages, determined to whom the messages would be transmitted, paid for the messages, and otherwise expressly authorized the transmission of the messages. First Amended Complaint at ¶¶ 22-36.

The allegations here are similar to those in *Maryland v. Universal Elections*, in which the court determined that the plaintiff sufficiently alleged control based liability against two individuals responsible for a political campaign's prerecorded voice calls, and the same result is warranted. *Universal Elections*, 787 F. Supp. 2d at 415-16 (denying motion to dismiss claims for personal liability for a campaign's prerecorded calls where the individual defendants hired a company to transmit prerecorded messages, recorded the messages, and determined to whom and when the messages would be sent); *see also Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 1:10-cv-253, 2012 U.S. Dist. LEXIS 85663 (W.D. Mich. June 21, 2012) (employee purportedly directed the creation of a fax recipient list, directed and supervised the individuals or entity that sent the fax, approved the form of the fax, determined the number and frequency of fax transmissions, and approved or paid for the fax transmissions); *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 775 F. Supp. 2d 1316, 1321 (D. Wyo. 2011) (employee was "directly involved in the collections efforts"; "he supervised collection activities and his voice appeared in the prerecorded messages" in the telephone calls); *cf. Lenhardt v. Democratic Party HQ*, No. 21-4001-DDC-ADM, 2021 U.S. Dist. LEXIS 132582, at *9-11 (D. Kan. July 16, 2021), which Pierce cites (*see* Motion at pp. 12-13), and in which a pro se plaintiff sued Joe Biden, Kamala Harris, Barack Obama, Hillary Clinton, and Elizabeth Warren for TCPA violations based on texts sent by three organizations, two of which specifically stated they were not authorized by or affiliated with any candidate or campaign,

15

because "plaintiff's Amended Complaint allege[d] no facts from which a finder of fact could infer plausibly that any of the individual defendants had responsibility for controlling the conduct that, she allege[d], violated the TCPA."

### c. Vicarious Liability

"[A] party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification principles. *Klein v. Just Energy Grp., Inc.*, No. 14-1050, 2016 U.S. Dist. LEXIS 84447, at *27 (W.D. Pa. June 29, 2016) (citing *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016)); *see also In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6588 (F.C.C. 2013). The existence of an agency relationship is normally one for the trier of fact to decide. *See Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988), *rev'd in part on other grounds, UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999).

A plaintiff is required to allege a sufficient basis for any "one of the common law agency theories." *Cunningham*, 2018 U.S. Dist. LEXIS 197590, at *17-21.  "[A] plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016) (relying on the FCC's *Dish Network* opinion issued in a telemarketing context in evaluating vicarious liability for non-telemarketing, TCPA violative calls, like Pierce's prerecorded voice calls).  A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016).

For TCPA claims specifically, there is a low bar to pleading vicarious liability, as a plaintiff is not expected to allege "facts suggesting that" the defendant: (1) "instructed" the putative agent "to make the call to" the plaintiff, (2) "had any authority over the time, means and manner of" the putative agent's solicitations, or (3) "had the ability to issue instructions … on these subjects." *Dolemba*, 213 F. Supp. 3d at 997 ("But Farmers does not suggest how Dolemba could reasonably be expected to know those facts at this stage in the litigation. Indeed, it is likely that all of the

documents and information that establish (or refute) the details of the agency relationship between Farmers and the Lombardi Agency are exclusively within the Defendants' custody and control."); *see Cunningham v. Rapid Response Monit. Servs.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) ("Cunningham has investigated the parties extensively, but inevitably some aspects of their relationships will only come to light in discovery.").

In this case, Plaintiff pleads robust facts giving rise to an inference that Pierce is vicariously liable for the campaigns calls to Plaintiff based on all three agency theories (actual agency, apparent agency, and ratification).

### *i. Actual Authority*

"Actual authority is the authority that a principal expressly or implicitly gives an agent." *United States v. Martinez*, 613 F.2d 473, 481 (3d Cir. 1980); *Lind v. Schenley Indus.*, Inc., 278 F.2d 79, 85 (3d Cir. 1960) ("'Actual authority' means, as the words connote, authority that the principal, expressly or implicitly, gave the agent."); *see Cunningham*, 251 F. Supp. 3d at 1199 ("The question of whether implied authority may have existed would require the Court to know more about the course of the parties' dealings and the generally expected course of business ...."). An agent acts with actual authority if it "reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01; *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) (citing Restatement (Third) of Agency § 2.01)).

Actual agency "does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, 2017 U.S. Dist. LEXIS 55023, at *21 (M.D. Fla. Apr. 10, 2017). "The concept of scope of authority is broad. An agent has authority to act to further the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives. The principal is liable for the acts of the agent to further the principal's purposes unless the agent acts entirely for the agent's benefit only." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 923 (C.D. Ill. 2017) (citing Restatement (Third) of

Agency § 2.02(1)).

Thus, for a TCPA claim, a plaintiff sufficiently pleads that a defendant directed an agent's calls by alleging facts giving rise to an inference that the defendant was "heavily involved" in the circumstances surrounding the calls. *United States*, 256 F. Supp. at 922-923; *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability.  They are more than sufficient, however, to entitle Dolemba to further discovery.").

Here, Plaintiff alleges that, to the extent Pierce did not initiate the prerecorded call to Plaintiff, Pierce actually authorized the campaign to make the call because he was heavily involved in the circumstances surrounding the call.  Specifically, Pierce controlled the manner and means of its promotion of his presidency by: expressly approving the transmission of the prerecorded messages; determining the content of the prerecorded messages; determining to whom they would be transmitted; identifying only himself, and not the campaign, as the person initiating the calls (*id*. at ¶¶); and funding the transmission of the prerecorded messages. First Amended Complaint at ¶¶ 22-29, 34-36. In fact, Pierce was heavily involved in the means and manner by which the campaign promoted his candidacy, including by personally controlling his campaign's public messaging. *Id*. at ¶¶ 32-33. And Pierce knew (or reasonably should have known) that his campaign was violating the TCPA on his behalf and failed to take effective steps within his power to force it to cease that conduct. *Id*. at ¶¶ 30-31.

The cases Pierce cites regarding political candidates' prospective liability for campaign acts are inapposite. Each of those cases involved contractual liability, and not tort liability like under the TCPA.  *See, e.g., Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1282 (5th Cir. 1994) ("A candidate for federal office already has at least two methods by which he could protect himself from ***personal liability for the contracts entered into by his principal campaign committee***."); *Vitale & Assocs., LLC v. Lowden*, 690 F. App'x 555, 556 (9th Cir. 2017) ("When it was not paid for those services, Vitale brought this ***action for breach of contract against Lowden personally***."); *Richmond Advert./Reinhold Assocs., Inc. v. Del Giudice*, 66 A.D.2d 701, 702 (N.Y. App. Div. 1978) ("It seems quite clear that those who became associated with the Blumenthal mayoral

campaign did not thereby intend or implicitly agree to become **personally liable for whatever obligations were incurred during the course of the campaign**, and that plaintiff could not reasonably have so understood."); *cf. Golan*, 930 F.3d at 960 ("In the portion of the TCPA creating a private cause of action, the TCPA does not specify against whom the action may be brought. See § 227(b)(3). In the analogous context of tort law, individuals are generally liable for any torts they commit, even those committed in the scope of their employment or in their role as corporate officers. *See Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001). Nor does the TCPA require that an officer's business be found liable before the officer may be held liable, as the defendants argued here. § 227(b)(1). Simply put, 'any person' who violates the TCPA may be liable."); *Universal Elections*, 787 F. Supp. 2d at 416 ("These cases reflect the general tort rule that 'corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body.'").

Therefore, at this stage of the proceedings, Plaintiff sufficiently shows that Pierce is vicarious liable for any TCPA violative calls made by his campaign on an actual authority theory.

### ii.      *Apparent Authority and Ratification*

Apparent authority "arises when a third-party reasonably believes that the [] agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011).

"To provide guidance in this area," the FCC has provided "illustrative examples of evidence that may demonstrate … apparent authority," including:  "the authority to use the [principal's] trade name, trademark and service mark"; "that the [principal] approved, wrote or reviewed the outside entity's … scripts"; and "if the [principal] knew (or reasonably should have known) that the [agent] was violating the TCPA on the [principal's] behalf and the seller failed to take effective steps within its power to force the [agent] to cease that conduct." *Dish Network*, 28 F.C.C. Rcd. at 6592 ("At a minimum, evidence of these kinds of relationships ... should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would

not sensibly assume that the telemarketer was actixng as the seller's authorized agent").[19]

"Ratification occurs when a principal knowingly chooses to accept the benefits of unauthorized actions an agent takes on the principal's behalf." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016); Restatement (Third) of Agency § 4.01(1) (2006) cmt. d. ("Ratification does not require a pre-existing formal agency relationship."). "[R]atification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act.  It is necessary that the actor have acted or purported to act on behalf of the ratifier."  Restatement (Third) of Agency § 4.01 cmt. b; *see Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (citing the Restatement and holding in a TCPA action that "ratification may create an agency relationship when none existed before the acts are 'done by an actor … who is not an agent but pretends to be.'").  To demonstrate prospective ratification, a plaintiff must show that a principal had full knowledge of all the facts, *or* was willfully ignorant of those facts, and manifested an intention to ratify the act in question, or that an agent acted for a principal's benefit and the principal "fail[ed] to object or repudiate an action."  *Henderson*, 918 F.3d at 1074-75; *Aranda*, 179 F. Supp. 3d at 831.

Here, Plaintiff sufficiently pleads Pierce's vicarious liability predicated on apparent authority and ratification theories based on the same allegations supporting an actual authority theory. First Amended Complaint at ¶¶ 22-36. Specifically, the voice messages were recorded by Pierce himself, featuring his voice and his message. *Id.* Pierce personally controlled the content of the prerecorded calls that he himself created, determined to whom the calls should be made, and otherwise authorized the prerecorded calls. *Id*. Pierce sent out the prerecorded messages to

---

[19] To the extent Pierce argues that the *Dish Network* or any other vicarious liability case Plaintiff cites is not relevant because they were issued in the telemarketing context, those cases are persuasive because they identify factors that are analogous in determining vicarious liability in a non-telemarketing context under 47 U.S.C. § 227(b)(1)(A)(iii), the TCPA provision applicable here.  *See, e.g., Dolemba*, 213 F. Supp. 3d at 995-97 (relying on the FCC's *Dish Network* opinion issued in a telemarketing context in evaluating vicarious liability for non-telemarketing, TCPA violative calls to cellular telephones); Motion at p. 17 (citing *Dish Network* to argue that Pierce did not initiate the call to Plaintiff).

individuals *without first obtaining their prior express consent* to receive prerecorded messages from Pierce. *Id*. Pierce knowingly and willingly violated the TCPA by allowing the sending out of prerecorded messages to individuals with whom he had no prior express consent and by personally participating in the TCPA violation for his own benefit.[20] *Id*.

Plaintiff therefore sufficiently pleads Pierce's vicarious liability for the call to Plaintiff under apparent authority and ratification theories.

### d. <u>Alter Ego Liability</u>

Under the TCPA, a person such as Pierce can also be liable for the acts of his campaign under an alter ego theory resulting in the piercing of the corporate veil.  *See Northrup v. Innovative Health Ins. Partners, LLC*, No. 8:17-cv-1890-T-36JSS, 2018 U.S. Dist. LEXIS 60552, at *7 (M.D. Fla. Apr. 10, 2018) (applying alter-ego theory of liability in TCPA case).

The "factors to be considered in veil piercing" include: "Inadequate capitalization in light of the purposes for which the corporation was organized"; "Extensive or pervasive control by the shareholder or shareholders"; and "Intermingling of the corporation's properties or accounts with those of its owner." *Velazquez v. P.D.I. Enters.*, 141 F. Supp. 2d 189, 193 (D.P.R. 1999).

Here, to the extent the prerecorded calls were made by the campaign, the campaign was Pierce's alter ego requiring veil piercing because: the campaign was improperly capitalized for an entity engaged in unsolicited robocalling or otherwise; the campaign and its calling conduct was controlled by Pierce; and the campaign's accounts were intermingled with Pierce's, resulting in Pierce spending "$6m, personally." First Amended Complaint at ¶¶ 22-36. Piercing the corporate veil is also necessary to promote public policy underlying the TCPA, if not, individuals would simply use undercapitalized corporate entities as the vehicles for making illegal TCPA violative calls while avoiding all liability.  This is not what Congress intended. *Universal Elections*, 787 F. Supp. 2d at 415-16 ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force."); *see Gager*, 727 F.3d at 271 ("The TCPA is a

---

[20] If Pierce's political campaign calls had been successful it is Pierce that would have been elected President of the United States—not his campaign.

remedial statute that was passed to protect consumers from unwanted automated telephone calls. See S. Rep. 102-178, at 5 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1972.").

## **CONCLUSION**

Plaintiff sufficiently alleges that he has standing by alleging that Pierce's prerecorded political campaign call was an annoyance, was a nuisance, invaded his privacy, consumed his phone line, disturbed the use and enjoyment of his phone, caused wear and tear on the phone's hardware (including the phone's battery), and consumed of memory on the phone and his voicemail.  These are the injuries Congress sought to prevent by enacting the TCPA.

Plaintiff also alleges four independently sufficient bases for finding Pierce liable for the political campaign calls based on Pierce's actual participation in making and authorizing the calls, and that, as a result, Plaintiff's injuries were traceable to Pierce's conduct.

The Court should therefore deny Pierce's motion to dismiss.

Respectfully Submitted,

NATHAN ROWAN, individually and on behalf of all others similarly situated individuals

DATED this 9th day of September, 2021.

/s/ Jairo Mellado-Villarreal
USDC-PR No. 208112
jmellado@mellado.com

/s/ Héctor Orejuela-Dávila
USDC-PR No. 301111
horejuela@mellado.com

Mellado & Mellado-Villarreal
165 Ponce de Leon Ave., Suite 102
San Juan, PR 00917
Telephone: (787) 767-2600
Facsimile: (787) 767-2645

Stefan Coleman (*pro hac vice*)
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscayne Blvd, 28th FL

22

Miami, FL 33131
Telephone: (877) 333-9427
Facsimile: (888) 498-8946

Avi R. Kaufman (*pro hac vice*)
kaufman@kaurmanpa.com
KAUFMAN P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Attorneys for Plaintiff and the putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that pursuant to L.Cv.R. 5.1(b) (2), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

In San Juan, Puerto Rico, this 9th day of September 2021.


*/s/ Jairo Mellado-Villarreal*
USDC-PR No. 208112
jmellado@mellado.com


**Mellado & Mellado-Villareal**
165 Ponce de León Ave., Suite 102
San Juan, Puerto Rico 00917-1235
Tel. (787) 767-2600
Fax (787) 767-2645

24