**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

NATHAN ROWAN, individually and
on behalf of all others
similarly situated

       **Plaintiff**

          v.

BROCK PIERCE

       **Defendant**

**CIVIL NO. 20-1648 (RAM)**

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Brock Pierce's ("Pierce" or "Defendant") *Motion for Summary Judgment*, accompanied by his *Statement of Undisputed Material Facts* ("*SUMF*"). (Docket Nos. 153 and 154). For the reasons discussed below, having considered the parties' submissions both in opposition to and in support of the same, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendant's *Motion for Summary Judgment*.

### I.   PROCEDURAL BACKGROUND

On November 16, 2020, Plaintiff Nathan Rowan ("Rowan" or "Plaintiff") filed a *Complaint* against former Independent presidential candidate Brock Pierce. (Docket No. 1). Subsequently, Plaintiff filed an *Amended Complaint* on July 12, 2021. (Docket No. 35). Rowan claims Pierce violated the Telephone Consumer Protection Act ("TCPA" or "Act"), 47 U.S.C. § 227(b)(1)(A)(iii),

by sending pre-recorded messages to promote Defendant's campaign to consumers' phone numbers, including Plaintiff's, without their consent. Id. ¶ 40.

Defendant filed a *Motion for Summary Judgment* on March 24, 2023. (Docket No. 153). Pierce asserted two main arguments: <u>first</u>, that Plaintiff lacks standing because he has not presented evidence of any injury-in-fact, and <u>second</u>, Defendant is not personally liable. Plaintiff filed a *Response in Opposition*, accompanied by his *Opposing Statement of Material Facts* ("*OSMF*") and *Additional Statement of Material Facts* ("*Add'l SMF*"), and Defendant filed a *Reply* containing a *Reply Statement of Undisputed Material Facts* ("*Reply SUMF*"). (Docket Nos. 170, 170-1, and 173, respectively).

## II.  LEGAL STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 175 (1st Cir. 2008) (citation and quotation marks omitted). A fact is considered material if it has "the potential to 'affect the outcome of the suit under governing law.'" <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657,

660–61 (1st Cir. 2000) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986)).

The party moving for summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." <u>Feliciano-Muñoz v. Rebarber-Ocasio</u>, 970 F.3d 52, 62 (1st Cir. 2020) (citation omitted). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006). However, it "cannot merely 'rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the evidence of an authentic dispute.'" <u>Feliciano-Muñoz</u>, 970 F.3d at 62 (quoting <u>McCarthy v. Nw. Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)). The nonmovant similarly cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to defeat summary judgment. <u>River Farm Realty Tr. v. Farm Family Cas. Ins. Co.</u>, 943 F.3d 27, 41 (1st Cir. 2019) (citation and quotation marks omitted).

In this District, summary judgment is governed by Local Rule 56. *See* L. CV. R. 56. Per this Rule, an opposing party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. CV. R. 56(c).

Furthermore, unless the fact is admitted, the opposing party must support each denial or qualification with a record citation. Id. In particular, citations must refer "to the specific page or paragraph or identified record material," and "[t]he court may disregard any statement of fact" that is improperly supported. L. CV. R. 56(e). If a party opposing summary judgment fails to comply with the rigors that Local Rule 56 imposes, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Thus, litigants ignore this rule at their peril. Id.

### III. PRELIMINARY MATTERS

As an initial matter, the Court considers issues raised by Defendant in his *Reply* regarding admissibility of evidence. Defendant moves to exclude portions of Plaintiff's *Response* as inadmissible. (Docket No. 173 at 11-12). These portions include a WhatsApp chat, Plaintiff's discovery responses and declaration, and the expert declaration of Randall Snyder. Id.

#### A. The WhatsApp Chat at Docket No. 112-7

Defendant seeks to exclude a WhatsApp chat purportedly containing conversations between Pierce and others on two bases: first, that its "veracity has never been tested" and second, that it contains inadmissible hearsay. (Docket No. 173 at 11). The Court

construes the first objection as a challenge to the document's authenticity. In general, "[e]vidence that is inadmissible at trial . . . may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998). Accordingly, unauthenticated documents typically cannot be used to defeat a motion for summary judgment. Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 666 (1st Cir. 2010); *see also* Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (citing to Fed. R. Civ. P. 56(e) for the proposition that "[d]ocuments supporting or opposing summary judgment must be properly authenticated."). However, following a 2010 amendment to Fed. R. Crim. P. 56, the essential inquiry is whether a party can show that it will be able to authenticate questioned evidence at trial. *See* Joseph v. Lincare, Inc., 989 F.3d 147, 155–57, 155 n.4 (1st Cir. 2021) (remarking that when documents are produced during the discovery process, they should be presumed to be authentic unless reason is given to think otherwise).

To authenticate evidence, "the proponent must produce evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The proponent may rely on the testimony of a witness with knowledge to do so. Id. 901(b). Evidence may also be authenticated through extrinsic evidence. *See* United States v. Browne, 834 F.3d 403, 413–415 (3d Cir. 2016)

(permitting authentication of group Facebook chats through circumstantial evidence).

The document in question here is the purported transcript of a WhatsApp group chat that included Pierce; John Souza ("Souza"), an associate of Pierce's; and Brian Anderson ("Anderson"), the owner and operator of a company called Media Mash, among others. *See* Docket No. 112 at 6–7. The WhatsApp chat was produced in response to a subpoena sent by Plaintiff to Media Mash. <u>Id.</u> Defendant questions the "veracity" of the WhatsApp chat because Plaintiff did not depose specific third parties in the chat.[1] (Docket No. 173 at 11). However, Plaintiff did depose both Pierce and Anderson. (Docket Nos. 154-1 and 154-2, respectively). During his deposition, **Anderson was shown the WhatsApp chat and acknowledged that it was the same chat that (1) he had participated in** with Defendant and other individuals and (2) he had testified about earlier in the day. (Docket No. 154-3 at 66). Anderson also noted that he believed a particular cell phone number in the chat belonged to the Defendant.[2] <u>Id.</u> at 67–68. Finally, there is circumstantial evidence in the WhatsApp chat that supports its

---

[1] Defendant nonetheless refers and cites to the WhatsApp chat in his own *SUMF*. (Docket No. 154 ¶¶ 44(a), 52-53).

[2] Defendant also acknowledged that phone number listed the WhatsApp chat that is attributed to him is, in fact, his personal cell phone number. (Docket No. 170-3 at 3).

authenticity, such as references to Defendant's presidential
campaign staff. *See, e.g.*, Docket No. 112-7 at 6 (referring to
Andy Do, the treasurer for Defendant's campaign). For these
reasons, the Court finds that Rowan has sufficiently authenticated
the WhatsApp chat in the record that it may be relied upon for
summary judgment purposes.

Turning next to the issue of hearsay, "[i]t is black-letter
law that hearsay evidence cannot be considered on summary
judgment." Dávila v. Corp. De P.R. Para La Difusión Pública, 498
F.3d 9, 17 (1st Cir. 2007); *see* Fed. R. Civ. P. 56(e) (requiring
parties to properly support an assertion of fact). Hearsay is an
out-of-court statement offered for the truth of the matter
asserted. Bonner v. Triple-S Mgmt. Corp., 68 F.4th 677, 689 (1st
Cir. 2023) (citing Fed. R. Evid. 801(c)). However, admissions made
by a party-opponent are not hearsay. Id. Nor are statements offered
for context, rather than for the truth of the matter asserted.
United States v. Cruz-Diaz, 550 F.3d 169, 176 (1st Cir. 2008)
(citing United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001)).

Here, Plaintiff relies on statements made by Pierce and others
in the WhatsApp chat. *See* Docket No. 170 at 12-13. Given that
Pierce is the named Defendant and Rowan's party-opponent, the
portions of the WhatsApp chat associated with Pierce's phone number
that Plaintiff used to support the *OSMF* and *Add'l SMF* are non-

hearsay and are therefore admissible in the summary judgment context. However, Plaintiff also refers to statements made by individuals speaking about the campaign. *See, e.g.*, Docket No. 170-1 at 20 (citing to statements made by two individuals regarding voicemail scripts). The individuals are unidentified "and, without that information, there is no reliable way to tell whether" their messages may fit within the category of statements that are not hearsay. Dávila, 498 F.3d at 17 (referring to Fed. R. Evid. 801(d)(2)). Accordingly, the WhatsApp chat messages sent by persons other than Defendant are hearsay and cannot be used to create a genuine dispute of material fact.

## B. Plaintiff's Discovery Responses and Declaration at Docket Nos. 13-1, 73-11, 73-12, 100-13, 170-4, and 170-5

Defendant also objects to inclusion of the Plaintiff's discovery responses and declaration because he claims they contain self-serving hearsay statements. (Docket No. 173 at 10). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence . . .." Fed. R. Civ. P. 56(c)(4). The First Circuit has consistently stated that affidavits submitted in opposition to a motion for summary judgment are insufficient if they merely reiterate allegations made in the complaint. Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016)

(citing Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000)). However, "whether a nonmovant's deposition testimony or affidavits might be self-serving is not dispositive." Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir. 2007). Affidavits that set forth specific factual information based on the party's personal knowledge must be considered with other evidence. Santiago-Ramos, 217 F.3d at 53. The timing of the proffered statements is also significant, and affidavits offered after the filing of a motion for summary judgment may constitute inappropriate attempts to manufacture issues of fact. Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380, 387 (1st Cir. 2016).

In his *Reply*, Defendant takes issue with a broad swath of materials.[3] However, the rule governing how courts should view affidavits supporting or opposing a motion for summary judgment "requires a scalpel, not a butcher knife," and an evaluating court must examine questioned affidavits segment by segment. Perez, 247 F.3d at 315. Defendant here refers to paragraphs in the Plaintiff's *OSMF* and *Add'l SMF* without listing the specific documents he seeks

---

[3] The Court notes that as an initial matter, the preferred mechanism for a party to voice objections to affidavits should be a motion to strike. *Cf.* Perez v. Volvo Car Corp., 247 F.3d 303, 314 (1st Cir. 2021) (nonetheless preserving a party's rights as to an allegedly deficient affidavit when objections were noted in a motion for summary judgment).

to exclude. *See* Docket No. 170 at 11 (referring to Plaintiff's discovery responses generally).

In support of Defendant's claim that Plaintiff's discovery responses and declaration should be excluded, he cites to Dávila, 498 F.3d at 17. (Docket No. 170 at 11). In Dávila, however, the First Circuit noted that the statement at issue was only hearsay because the appellant had no personal knowledge of the conversation he included in the affidavit. *See* id., 498 F.3d at 17. The same is not true here. After reviewing the materials in question, it is clear most of the documents contain sufficient specific factual information based on Rowan's personal knowledge. To the extent that statements used to support the *OSMF* and *Add'l SMF* were not based on personal knowledge, they have been excluded from the findings of fact and from consideration. Finally, the documents in question were not filed after the motion for summary judgment, and they are therefore unlikely to be sham affidavits.

**C. Expert Report at Docket No. 170-6**

Defendant further objects to any reliance on the expert declaration of Randall Snyder because it constitutes inadmissible hearsay. (Docket No. 170 at 11–12). Because the Court did not rely on the expert declaration for the purposes of evaluating this motion, Defendant's request is moot.

## IV.  FINDINGS OF FACT

To make findings of fact, the Court analyzed Defendant's *SUMF*, Plaintiff's *OSMF* and *Add'l SMF*, and Defendant's *Reply SUMF* (Docket Nos. 154, 170-1 at 1-18, 170-1 at 18-23, and 173 at 13-16, respectively).

After **only crediting material facts** that are **properly supported by a record citation and uncontroverted**, the Court makes the following findings of fact[4]:

### A. Plaintiff Received a Voicemail

1. On October 29, 2020, Plaintiff Nathan Rowan received a single ringless voicemail. (Docket No. 154 ¶ 1).

2. On October 29, 2020, Plaintiff was on his iPhone XR cell phone speaking with a coworker. The conversation was not work-related. (Docket No. 154-1 at 123).

3. An incoming call showed up on Plaintiff's phone during the call with his coworker, and then the incoming call notification on his phone screen went away. (Docket No. 154-1 at 138-39).

4. Plaintiff subsequently received a notification that he had a voicemail. (Docket No. 154-1 at 165).

---

[4] References to a Finding of Fact shall be cited as follows: (Fact ¶ _).

5. Plaintiff read the transcript of the voicemail message and
   believed it was an unsolicited spam call. He ended his call
   with his coworker to document the voicemail as evidence.
   (Docket No. 154 ¶ 60).

6. Plaintiff also listened to the voicemail. (Docket No. 170 at
   22).

7. Plaintiff was furloughed from his day job from July 2020
   through April 2021. During this time, he was legally not
   allowed to do any work. (Docket No. 154 ¶ 1-2).

8. Plaintiff's receipt of the ringless voicemail did not
   increase the cost of his monthly cell phone bill. Id. ¶ 71.

9. Plaintiff's employer paid for his phone's monthly service
   plan, and his employer incurred no extra charge for the
   voicemail message. Id. ¶ 72.

10. Plaintiff has pursued TCPA class action claims against other
    defendants. Id. ¶ 2.

**B. Defendant's Political Campaign**

11. Defendant Brock Pierce was a candidate for President of the
    United States during the 2020 election cycle. Id. ¶ 3.

12. The Brock Pierce for President, Inc. campaign (the
    "Campaign") was incorporated in July 2020 and was operated by
    a campaign manager and a team of political staffers and

volunteers. Andy Do was the Treasurer of the Campaign and John Souza was a volunteer for the Campaign. Id. ¶ 4.

13. The Campaign was incorporated as a separate legal entity to distribute Defendant's political message. Id. ¶ 16.

14. Defendant loaned the campaign approximately six million dollars. (Docket No. 112-5 at 38).

15. Media Mash is a marketing services company hired by the Campaign and was the marketing vendor that physically initiated and executed the ringless voicemail program at issue in this case. (Docket No. 154 ¶ 5).

16. Souza reached out to Media Mash and coordinated the ringless voicemail campaign. Id. ¶ 35.

17. Brian Anderson is the owner, operator, and lead decision-maker at Media Mash. Id. ¶ 6.

18. Anderson communicated with Pierce via a WhatsApp chat, but never met or spoke to Pierce on the phone. (Docket Nos. 154 ¶ 7; 154-3 at 60; and 170-3 at 3).

19. Anderson testified that, because Media Mash's customer was the Campaign, he took direction from persons who worked for the Campaign. Anderson further understood that if Pierce "told [him] to do X, Y, Z, then [he] would assume [he] should do X, Y, Z." (Docket No. 154-3 at 28-29).

**C. Ringless Voicemails for the Campaign**

20. The Campaign's marketing team and Media Mash coordinated Facebook ad campaigns, radio advertisement spots, ringless voicemails, and other voter outreach. (Docket No. 154 ¶ 34).

21. The Campaign and Media Mash executed an agreement for, among other things, ringless voicemail services. The Campaign was considered the customer, and the agreement detailed that Media Mash would "architect a custom strategy for the Brock Pierce for President Campaign," including through ringless voicemails to residents of Alaska, Idaho, Utah, Vermont, and Wyoming. Id. ¶ 37

22. Media Mash was paid by the Campaign for providing the ringless voicemail services. Id. ¶ 39.

23. Media Mash, on behalf of the Campaign, organized, executed, and sent the ringless voicemails to voters, including to Plaintiff. Id. ¶ 43.

24. The phone numbers for the calls to the aforementioned five states were obtained from lead lists that the Campaign purchased from a company called Aristotle. Id. ¶ 44; (Docket Nos. 122-1 ¶ 9 and 112-5 at 267).

25. Stratics Network ("Stratics") is the software platform that Media Mash used to mobilize the ringless voicemail program for the Campaign, and there is no evidence that Mr. Pierce or

the Campaign knew that Media Mash had selected or would use Stratics. (Docket No. 154 ¶ 9).

26. Media Mash used the Stratics platform to send ringless voicemails, and no one else had access to the Stratics platform for such purposes. Id. ¶ 41.

27. The Stratics platform identified the client as BP4P, referring to "Brock Pierce for President," or the Campaign. Id. ¶ 42.

28. The pre-recorded messages were recorded by Defendant with his own voice. (Docket No. 170-1 at 18).

29. Defendant recorded different pre-recorded messages for different states. Id.

30. At the beginning, all of the pre-recorded messages specifically identified "Brock Pierce" as the person initiating the calls; no other person or entity is identified at any other point during the prerecorded message. Id.

31. On October 25, 2020, Defendant asked in the WhatsApp chat: "How are the [voicemails] and ads doing?" and Anderson responded: "Hi Brock – first [voicemails] hit at 9:30 PDT on Monday. We are using the new ones you recorded." Id. at 19; (Docket No. 112-7 at 9).

32. On October 27, 2020, Defendant asked in the WhatsApp chat what was going on with the calls, saying: "I'm so concerned

I want to stop it all . . . Sounds like we are calling a few
thousand people a few thousand times". Defendant also
expressed that the individuals working on sending voicemails
had spent money on a poor quality list, and told the WhatsApp
chat: "PAUSE ALL CALLS[.] THIS ISN'T WORKING AS PLANNED" and
"STOP EVERYTHING UNTIL I SEE THE DATA[.] WHO WAS CALLED WHERE
AND HOW MANY TIMES". (Docket No. 112-7 at 13-14) (emphasis in
original).

33. On October 28, 2020, Defendant asked: "Do we have the right
    data now?". <u>Id.</u> at 21.

34. Anderson confirmed in his deposition that on October 28, 2020,
    he had asked for the direct link to Aristotle data, stated
    that he had received it, and acknowledged he replied to Pierce
    in the WhatsApp chat that Anderson had the new data and was
    in the process of uploading the new files. (Docket No. 154-3
    at 80, 87-88).

35. On October 28, 2020, Defendant wrote in the WhatsApp chat:
    "After the first round of calls I'd like us to do another
    round of IVR in the key states[.] Then second set of
    [voicemails.]" (Docket No. 112-7 at 21).

36. On October 29, 2020, Defendant posted an image of a consumer
    complaint regarding the prerecorded calls in the WhatsApp
    chat, to which Souza responded: "You are sending 100's of

thousands of drops out. Expect complaints." (Docket No. 170-1 at 19).

37. Later that day, Defendant wrote in the WhatsApp chat: "We did Alaska, Utah, Idaho, and Wyoming? And NY? Minnesota next?" Id.

38. The Campaign continued to operate the ringless voicemail campaign until November 3, 2020. Id.; (Docket No. 173-2 at 14).

## V.   ANALYSIS

### A. Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021). To establish Article III standing, a plaintiff must have: (1) suffered an injury-in-fact; (2) that is fairly traceable to defendant's challenged actions; and (3) that is likely redressable by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). At issue here is the "injury-in-fact" requirement, which the Supreme Court defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. (citations and quotations omitted).

For an injury to be concrete, "it must actually exist." Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016). Though the injury need not be tangible, a "bare procedural violation" of a "statutory right" does not confer Article III standing. Id. at 340-41. When evaluating whether an intangible harm confers standing, a district court must consider both "history and tradition" as well as the "the judgment of Congress." TransUnion, 141 S. Ct. at 2204-05; Spokeo, 578 U.S. at 340.

A claim under section 227(b)(1)(A)(iii) of the TCPA has the following elements: "(1) the defendant used an automatic dialing system or an artificial or prerecorded voice, (2) to call a telephone number assigned to a cellular telephone service or to a service for which the called party is charged for the call." Breda v. Cellco P'ship, 934 F.3d 1, 4 (1st Cir. 2019) (referring to 47 U.S.C. § 227(b)(1)(A)(iii)). As the Court noted in a previous order in this case, the First Circuit has not weighed in on whether a single prerecorded call can constitute an injury-in-fact under the TCPA. (Docket No. 46 at 4). However, several other circuits that analyzed standing issues in the wake of TransUnion and Spokeo have concluded that a plaintiff's allegation of a single unwanted call[5] or text message is sufficient to establish injury in fact.

---

[5] According to guidance issued by the Federal Communications Commission ("FCC"), a ringless voicemail is a "call" covered by section 227(b)(1)(A)(iii) of the

*See, e.g.*, <u>Drazen v. Pinto</u>, 2023 WL 4699939, at *5-7 (11th Cir. 2023) (en banc) (collecting cases and concluding single text message is sufficient for standing);[6] <u>Dickson v. Direct Energy, LP</u>, 69 F.4th 338, 349 (6th Cir. 2023) (single ringless voicemail establishes standing); <u>Cranor v. 5 Star Nutrition, L.L.C.</u>, 998 F.3d 686, 690 (5th Cir. 2021) (single text message sufficient for standing); <u>Susinno v. Work Out World Inc.</u>, 862 F.3d 346, 352 (3d Cir. 2017) (unsolicited call resulting in one minute voicemail conferred standing); *see also* <u>Gadelhak v. AT&T Servs., Inc.</u>, 950 F.3d 458, 463 n.2 (7th Cir. 2020) (Barrett, J.) ("the number of texts is irrelevant to the injury-in-fact analysis"); <u>Golan v. FreeEats.com, Inc.</u>, 930 F.3d 950, 959 (8th Cir. 2019) ("that the harm suffered here was minimal" does not matter for standing analysis); <u>Melito v. Experian Marketing Solutions, Inc.</u>, 923 F.3d 85, 94 (2d Cir. 2019) (unspecified number of text messages demonstrate standing).

---

TCPA. <u>In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 Petition for Declaratory Ruling of All About the Message, LLC</u>, No. CG02-278, 2022 WL 17225556, at *1 (OHMSV Nov. 21, 2022).

[6] Defendant cites to cases from the Eleventh Circuit in support of his claim that Plaintiff has no standing. (Docket No. 153 at 4, 14-15); *see* <u>Grigorian v. FCA US LLC</u>, 838 F. App'x 390, 392-94 (11th Cir. 2020) (holding that single ringless voicemail was insufficient for standing without conducing <u>Spokeo</u> standing inquiry); <u>Eldridge v. Pet Supermarket Inc.</u>, 446 F. Supp. 3d 1063, 1066 (S.D. Fla. 2020) (multiple text messages insufficient to establish standing). However, both <u>Grigorian</u> and <u>Eldridge</u> relied heavily on the reasoning from <u>Salcedo v. Hanna</u>, 936 F.3d 1162, 1170-72 (11th Cir. 2019), which was overturned by <u>Drazen</u>.

Additionally, several district courts in this circuit have also held that unsolicited calls and messages confer standing under the TCPA. *See, e.g.*, Laccinole v. Students for Life Action Inc., 2022 WL 3099211, at *3 (D.R.I. 2022) (text messages create standing); Sagar v. Kelly Auto. Grp., Inc., 2021 WL 5567408, at *3-4 (D. Mass. 2021) (at least three text messages establish standing); Carl v. First Nat'l Bank of Omaha, 2021 WL 2444162, at *7 (D. Me. 2021) ("each violating call is already sufficiently concrete in itself"); Clough v. Revenue Fronter, LLC, 2019 WL 2527300, at *3 (D.N.H. 2019) (single text message sufficient for standing).

The Court agrees with these persuasive authorities. Dickson is particularly instructive here, given its similarities to the facts of the case at bar. Pierce argues that Rowan did not incur additional fees due to the ringless voicemail and did not suffer additional "wear and tear" to his phone. (Docket No. 153 at 15). In Dickson, the plaintiff: (a) could not remember if he was interrupted by a single ringless voicemail; (b) was not charged for the voicemail; (c) did not establish that the voicemail tied up his phone line; and (d) spent very little time reviewing the voicemail. Id., 69 F.4th at 342. However, the Sixth Circuit nevertheless found the plaintiff in Dickson still sufficiently established Article III standing because the harm he suffered was

analogous **in kind** to injuries recognized by common law. Id. at 348
(emphasis added). Accordingly, Rowan, too, has sufficiently
alleged an injury-in-fact to establish Article III standing.

Defendant further argues that Plaintiff did not suffer an
injury-in-fact because—in Pierce's view—Rowan was excited to
receive the ringless voicemail and did not experience annoyance,
nuisance, or an invasion of privacy. (Docket No. 153 at 15).
Pierce's discussion of Rowan's financial incentive to file TCPA
suits is appropriately classified as a challenge to the Plaintiff's
statutory standing. *See, e.g.*, Carl, 2021 WL 2444162, at *8
(defendant argued plaintiff lacked statutory standing because he
allowed unwanted calls to continue); Katz v. Liberty Power Corp.,
LLC, 2019 WL 4644424, at *10 (D. Mass 2019) (defendant argued
plaintiff lacked prudential standing because he turned unwanted
calls into financial opportunity). However, Rowan's filing of
other TCPA suits has no bearing on his standing to file this one.
*See* Carl, 2021 WL 244162, at *8 n.9 (plaintiff's use of cell phone
for reasons other than to generate TCPA claims "is likely
sufficient to bring him within the zone of statutory standing");
Katz, 2019 WL 2644424, at *10 (plaintiff's standing depends on
whether he maintained telephone number "for any other purpose other
than attracting telemarking calls to support his TCPA lawsuits").
Plaintiff here has filed other TCPA suits, but he also maintained

his phone for a plethora of other reasons, including for personal calls. (Fact ¶ 2; Docket No. 154-1 at 132-34). As such, Plaintiff remains within the zone of interest that the TCPA was intended to protect, and he has statutory standing.

In sum, the motion for summary judgment on standing grounds is **DENIED**.

**B. Personal Liability**

The TCPA makes it unlawful:

> [T]o make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call . . ..

47 U.S.C. § 227(b)(1)(A)(iii). The TCPA is a strict liability statute. Breda, 934 F.3d at 4. It provides a private right of action and allows claims for actual or statutory damages. 47 U.S.C. § 227(b)(3).

The litigants raise and contest several theories of personal liability under the TCPA—an area which the First Circuit has not yet addressed. Each of them is discussed in turn below.

     i.   <u>Direct Liability</u>

The plain language of the TCPA makes clear that a defendant is directly liable when he or she makes a call. *See* <u>Golan</u>, 930

F.3d at 960 ("The scope of direct liability is determined by the statutory text."). The Federal Communications Commission ("FCC") analyzed liability under § 227(b)(1)(B) and concluded that, to be held directly liable, a defendant must initiate a call. In re DISH Network, LLC, 28 FCC Rcd. 6574, 6582 (2013); *see also* Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 168 (2016) ("[w]e have no cause to question [the FCC's ruling in DISH Network]"); In re Dialing Servs., LLC, 29 FCC Rcd. 5537, 5543 (2014) ("The same logic that DISH Network applied to robocalls to landline phones with respect to 'initiation' of calls (Section 227(b)(1)(B) of the Act) likewise applies to robocalls to wireless phones with respect to 'making' calls (Section 227(b)(1)(A) of the Act)."). A defendant initiates a call "when it takes the steps necessary to physically place a telephone call." DISH Network, 28 FCC Rcd. at 6583. There must be a "direct connection between a person or entity and the making of a call," and the scope of direct liability does not include those "that might merely have some role, however, minor, in the causal chain that results in the making of a telephone call." Id.

Notably, the FCC has generally limited direct liability to telemarketers who make phone calls on behalf of sellers and

declined to extend such liability to the sellers themselves.[7] <u>DISH</u>
<u>Network</u>, 28 FCC Rcd. at 6583. As an example of when liability could
be extended, the FCC has suggested that a seller would be directly
liable if it was deeply involved in the placing of a telephone
call, such as by giving "specific and comprehensive instructions
as to timing and the manner of the call . . .." <u>Id.</u> The FCC has
further clarified that certain activities are "plainly within the
understanding of 'making' or 'initiating' a call under the <u>DISH</u>
<u>Network</u> standard." <u>Dialing Servs.</u>, 29 FCC Rcd. at 5544-45. The
type of conduct that can trigger direct liability includes:

> (1) providing a software platform for making
> robocalls; (2) leasing or otherwise securing
> telephone connections for making robocalls;
> (3) purchasing voter lists; (4) providing
> technical support; (5) reviewing and/or
> editing messages; (6) reviewing phone numbers
> to determine if they are valid; (7)
> transmitting the calling party's number to be
> displayed by the call recipient's caller
> identification services; (8) storing the
> prerecorded message on a server; (9) playing
> a recorded message to a called party; (10)
> detecting whether a call is answered by a live
> person or by an answering machine; (11)
> providing reports of call history, results,
> and polling; and (12) dialing telephone
> numbers.

<u>Worsham v. TSS Consulting Group, LLC</u>, 2023 WL 2664203, at *5 (M.D.
Fla. 2023) (citing <u>Dialing Servs.</u>, 299 FCC Rcd. at 5543-44). In

---

[7] Defendant's role here would be akin to that of a "seller."

short, a defendant is directly liable under the TCPA if it is the entity "that places the unlawful telephone calls," Smith v. Liberty Mut. Ins. Co., 2021 WL 1581017, at *3 n.1 (D. Mass. 2021), or if it "developed or authorized the policies and procedures that led to violations of the TCPA." McGee v. Halsted Fin. Servs. LLC, 2014 WL 1203138, at *1 (D. Del. 2014); see also Childress v. Liberty Mut. Ins. Co., 2018 WL 4684209, at *3 (D.N.M. 2018) (collecting cases).

Here, it is undisputed that the entity that transmitted the prerecorded message was Media Mash, through the Stratics platform. (Fact ¶ 26). As such, direct liability does not apply to Defendant. See Thomas v. Taco Bell Corp., 582 F. App'x 678, 679 (9th Cir. 2014) (affirming district court that direct liability under the TCPA did not apply when parties agreed that actual sender of subject text message was a third party).

Without citing to any case law, Plaintiff recites a litany of Defendant's purported actions that would confer direct liability. (Docket No. 170 at 11-13). These include, for example, recording a voicemail message that only identifies Brock Pierce and not the Campaign, being aware of the transmitting of ringless voicemails, having control over the content of call scripts, and purchasing voter lists. Id. The latter two activities are certainly types of conduct that the FCC recognized could contribute toward a

conclusion that Pierce may be directly liable. *See* <u>Worsham</u>, 2023 WL 2664203, at *5 (listing "purchasing voter lists" and "reviewing and/or editing messages" as two out of a total of twelve actions that led to a conclusion that a defendant was directly liable under the TCPA). **However, it was the Campaign, not Pierce, that actually purchased the voter lists**. (Fact ¶ 24). Moreover, Plaintiff offers no admissible evidence in either his *OSMF* or *Add'l SMF* that Defendant had a hand in drafting or editing the call scripts.[8] Taken together, Defendant's purported actions are insufficient to create a genuine issue of material fact that he placed the offending call or developed the policies and procedures facilitating it.

In conclusion, a reasonable finder of fact could not reasonably conclude on the provided record that Defendant is directly liable. As such, the motion for summary judgment is **GRANTED** on this theory of liability.

ii.  <u>Vicarious Liability</u>

Even when a party is not directly liable, it may nevertheless be vicariously liable "under federal common law principles of agency for TCPA violations committed by third-party

_____

[8] Per Defendant's *Reply*, Pierce stated in his deposition that while he did not have any input into the scripts, he "may have ad lib[bed] a line or two if [he] had the transcript . . .." (Docket Nos. 173 at 6 and 154-2 at 103).

telemarketers." DISH Network, 28 FCC Rcd. at 6584. These agency

principles include "not only formal agency [or actual authority],

but also . . . apparent authority and ratification." Id.; *see also*

FDS Rest., Inc. v. All Plumbing, Inc., 241 A.3d 222, 238 n.24 (D.C.

2020) (noting that a different provision of the TCPA, 47 U.S.C.

§ 217, creates vicarious liability for the acts of an agent).[9] The

plaintiff must establish the agency relationship between the

defendant and the third-party caller to establish vicarious

liability. *See* Henderson v. United Student Aid Funds, Inc., 918

F.3d 1068, 1072-73 (9th Cir. 2019), *as amended on denial of reh'g*

*and reh'g en banc* (May 6, 2019) (citing Gomez v. Campbell-Ewald

Co., 768 F.3d 871, 878 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016),

*as revised* (Feb. 9, 2016)).

Deciding the issue of vicarious liability at the summary

judgment stage is appropriate only when "evidence of the

relationship is clear and unequivocal." Shamblin v. Obama for Am.,

2015 WL 1754628, at *6 (M.D. Fla. 2015). "Vicarious liability under

the TCPA is a fact intensive inquiry . . .." Smith, 2021 WL

1581017, at *4. Though the existence of an agency relationship is

usually a question of fact for the jury, a district court may

nonetheless find no such relationship exists if there is no genuine

---

[9] Section 217 is discussed further in Section V.B.iii of this Opinion and Order.

issue of material fact. <u>McDermet v. DirecTV, LLC</u>, 2021 WL 217336, at *7 (D. Mass 2021) (citing <u>White's Farm Dairy, Inc. v. De Laval Separator Co.</u>, 433 F.2d 63, 66 (1st Cir. 1970)) (quotations omitted). Additionally, the court may "consider whether the parties are trying to limit or prevent liability by characterizing their relationship as something other than an agency relationship." Restatement (Third) of Agency § 1.02; <u>Henderson</u>, 918 F.3d at 1073.

Plaintiff's *Amended Complaint* appears to contemplate Defendant as principal and the Campaign as his agent.[10] (Docket No. 35 ¶ 57–58). Accordingly, for the purposes of evaluating the *Motion for Summary Judgment* and based on admitted facts, the Court will assume without deciding that Media Mash and Stratics are subagents of the Campaign.[11] "A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) of Agency § 3.15. If the principal grants an agent actual or apparent authority to do so, the agent may appoint a subagent. <u>Id.</u>

---

[10] The Campaign, Media Mash, and Stratics are all non-parties to this action.

[11] "Subagents may be appointed in series." Restatement (Third) of Agency § 3.15 cmt. c.

a.  *Actual Authority*

Actual authority refers to the manifestations that a principal makes to an agent. Ophthalmic Surgeons, Ltd. v. Paychex, Inc., 632 F.3d 31, 38 n.6 (1st Cir. 2011) (citations omitted); Restatement (Third) of Agency § 2.01. Actual authority may be express or implied. Id. § 2.01 cmt. b. An agent acts with express authority when the principal has provided authority through specific or detailed language, whereas an agent acts with implied authority when he acts as necessary to accomplish express responsibilities or acts in accordance with his reasonable interpretation of the principal's manifestations given all attendant circumstances. Id.

To establish liability under this theory in a TCPA context, the essential inquiry is whether there was "actual authority to place the unlawful calls." Jones v. Royal Admin. Servs., Inc., 887 F.3d 443, 449 (9th Cir. 2018). In answering this question, courts look to the degree of control that the principal exercised over the agent. Smith, 2021 WL 1581017, at *5 (citing Legg v. Voice Media Grp., Inc., 20 F. Supp. 3d 1370, 1377 (S.D. Fla. 2014)). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restatement (Third) of Agency § 1.01 cmt. f. With regard to TCPA violations, the principal

must have "control over the manner and means of the agent's calling activities." Worsham, 2023 WL 2664203, at *6 (citations and internal quotation marks omitted). Callers who violate a defendant's explicit instructions also lack express authority. McDermet, 2021 WL 217336, at *8. Actual authority is limited to actions requested in "a written or oral communication or consistent with a principal's general statement of what the agent is supposed to do." Jones, 887 F.3d at 449.

In this case, there is no written or oral evidence that the Campaign, Media Mash, or Stratics had *express* authority from Defendant himself to send a TCPA-violative ringless voicemail to the Plaintiff. However, there is a genuine issue of material fact as to whether the Campaign and its subagents had *implied* authority to call Rowan. Defendant interjected in the WhatsApp chat at various moments with instructions to stop the calls, use voter lists purchased by the Campaign, ask for data, or to inquire as to which states had already been called. (Facts ¶¶ 31-37). Anderson testified that he understood that because Media Mash had been hired by the Campaign, he should accede to demands made by Pierce, the candidate. (Fact ¶ 19).

The Court also notes that generally, contracts that contain the terms requiring compliance with state and federal laws can serve as evidence that there is a lack of actual authority to

violate the TCPA. *See* <u>McDermet</u>, 2021 WL 217336, at *8 (factoring
in the terms of contracts with authorized retailers in evaluating
express and implied authority). Here, the parties do not point to
any evidence in the record of a clear contract that expressly
prohibits or authorizes TCPA violations. In fact, the agreement
Media Mash executed with the Campaign is silent as to compliance
with the TCPA and notes: "Media Mash requires no contracts – this
allows for termination of contract by either party." (Docket No.
154-3 at 115).

Thus, viewed in the light most favorable to Plaintiff, the
communications between Anderson, the Campaign, and Pierce could
give the reasonable impression that Pierce impliedly authorized
the Campaign to call Rowan. As a result, a reasonable jury might
find that Pierce and the Campaign were in an agency relationship
that makes Defendant personally liable for violations of the TCPA.
Accordingly, summary judgment on this theory of liability is
**DENIED**.

> b.   *Apparent Authority*

Apparent authority exists when "a third party reasonably
believes the actor has authority to act on behalf of the principal
and that belief is traceable to the principal's manifestations."
Restatement (Third) of Agency § 2.03. Apparent authority is only
created by the principal's manifestations to the third party, not

the agent's representations of authority. Moreau v. James River-Otis, Inc., 767 F.2d 6, 10 (1st Cir. 1985) (citing Restatement (Second) of Agency § 27). To be held liable under this theory, the principal must hold "the agent out to third parties as possessing sufficient authority to commit the particular act in question," and the third party must "rel[y] upon the apparent authority." Keating v. Peterson's Nelnet, LLC, 615 Fed. App'x 365, 374 (6th Cir. 2015) (citation omitted); see also Warciak v. Subway Rests., Inc., 949 F.3d 354, 357 (7th Cir. 2020) (noting that reasonable reliance is necessary to establish apparent authority). Furthermore, the third party's belief about apparent agency must be reasonable. Vazquez-Robles v. CommoLoCo, 757 F.3d 1, 7 (1st Cir. 2014).

Illustrative examples provided by the FCC that demonstrate apparent authority include:

> (1) allowing access to "information and systems that normally would be within the seller's exclusive control;" (2) providing access to customer information; (3) allowing the third party to "enter consumer information into the seller's sales or customer systems;" (3) approving a telemarketing script; or (4) knowing of TCPA violations and failing to stop such violations.

Shamblin, 2015 WL 1754628, at *6 (quoting DISH Network, 28 FCC Rcd., at 6593-94). However, "[t]he use of a defendant's trademark or name **alone** is 'not sufficient to establish apparent authority.'"

Doane v. Benefytt Techs., Inc., 2023 WL 2465628, at *10 (D. Mass.
2023) (citing McDermet, 2021 WL 217336, at *10) (emphasis added).
*But see* Garvey v. Citizens for Rauner, Inc., 2020 WL 13512715, at
*3 (N.D. Ill. 2020) (finding that allegations of apparent authority
of a political campaign were sufficiently plausible to survive a
motion to dismiss where plaintiff received ringless voicemail
soliciting support for the candidate's campaign that was recorded
in candidate's voice and stated it was paid for by the campaign).

As relevant to the question of apparent authority, the *Amended
Complaint* only alleges that Defendant is liable on this theory
because he "[i]dentif[ied] only himself, and not the campaign, as
the person initiating the calls . . .." (Docket No. 35 ¶ 57).
Plaintiff argues that Defendant is liable on a theory of apparent
authority as well as a ratification theory—discussed further
*infra*—for the ringless voicemails because he made prerecorded
messages. (Docket No. 170 at 19 n.4). However, Plaintiff does not
offer any evidence that the prerecorded voice message was a grant
of apparent authority to the purported agent or subagents—that is,
the Campaign, Media Mash, or Stratics—and in fact, the names of
these entities are not mentioned in the voice message. *See* Smith
v. State Farm Mut. Auto. Ins. Co., 30 F. Supp. 3d 765, 778 (N.D.
Ill. 2014) (finding no apparent authority in part because there
was nothing in the prerecorded message that would suggest the

telemarketer was acting as an agent of the defendants). There is no identifiable statement made by the Defendant to the Plaintiff in the record that could allow Rowan to reasonably believe Pierce authorized agents to call him. Accordingly, the motion for summary judgment on this theory of liability is **GRANTED**.

      c.   *Ratification*

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). A principal ratifies an act of an agent by either manifesting assent that its legal relationships will be affected by the act, or through conduct that justifies a reasonable assumption that the principal consents. Id. § 4.01(2). Ratification can create "consequences of actual authority, including in some circumstances, creating an agency relationship when none existed before." Henderson, 918 F.3d at 1073 (citing Restatement (Third) of Agency § 4.01 cmt. b.). A principal may ratify the acts of an agent in two ways. Henderson, 918 F.3d at 1073. First, the principal can knowingly accept the benefit of a transaction in a manner that is "objectively or externally observable." Id. (citing Restatement (Third) of Agency § 4.01 cmt. d.). Second, the principal may choose to be willfully ignorant, remaining unaware of material facts but nonetheless choosing to

ratify "with awareness that such knowledge was lacking."
Henderson, 918 F.3d at 1073-74 (citing Restatement (Third) of
Agency § 4.01 cmt. b.).

Vis-à-vis the TCPA, a defendant is vicariously liable under
a ratification theory if it specifically ratifies the unlawful
conduct at issue. *See* Smith, 2021 WL 158107, at *6 (citing DISH
Network, 28 FCC Rcd. at 6582). In particular, the defendant must
have "knowledge of the calls or of the allegedly illegal marketing
methods." Doane, 2023 WL 2465628, at *11. The extent of the
principal's knowledge may be established through circumstantial
evidence. Henderson, 918 F.3d at 1075 (citing Restatement (Third)
of Agency § 4.06 cmt. b.). Defendants who terminate their
relationships with offending callers or otherwise disavow TCPA-
violative conduct are not liable under a ratification theory. *See*
McDermet, 2021 WL 217336, at *11-12 (granting summary judgment on
this theory). Moreover, mere awareness of commonplace marketing
methods is not enough to require a defendant to investigate whether
the purported agent was violating the TCPA. Kristensen v. Cell
Payment Servs., Inc., 879 F.3d 1010, 1015 (9th Cir. 2018); *see
also* Smith, 2021 WL 1581017, at *6 (granting motion to dismiss and
finding no ratification where complaint alleged defendant was
aware of telemarketing methods, but not of calls made to
plaintiff).

There is a genuine issue of material fact in this case as to whether Defendant ratified the Campaign and Media Mash's actions. For example, after inquiries about the data used by Media Mash, Defendant was informed by Anderson that new data had been uploaded. (Facts ¶¶ 32-34). Defendant was also aware of complaints from callers. (Fact ¶ 36). The Campaign and Media Mash nonetheless continued to distribute ringless voicemails. (Fact ¶ 38). Defendant does point to evidence that he asked the Campaign to reevaluate its process for making calls once he learned of a single caller complaint. (Docket Nos. 173 at 13, 154-2 at 107-08). Nevertheless, such efforts are not sufficient to warrant a grant of summary judgment. *See* <u>Aranda v. Caribbean Cruise Line, Inc.,</u> 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016) (denying summary judgment where, although defendant made some attempts to cease unlawful conduct, a reasonable jury could nonetheless conclude that it was still accepting the benefits of an unlawful call campaign). Because a reasonable jury could find Defendant ratified the actions of the Campaign and Media Mash, summary judgment on this theory of liability is **DENIED.**

   iii. <u>Control Based Liability</u>

Plaintiff pleads another theory of liability based on section 217 of the TCPA. (Docket No. 35 ¶¶ 60-62). That section provides that:

> the act, omission, or failure of any officer,
> agent, or other person acting for or employed
> by any common carrier or user, **acting within
> the scope of his employment**, shall in every
> case be also deemed to be the act, omission,
> or failure of such carrier or user as well as
> that of the person.

47 U.S.C. § 217 (emphasis added). Vicarious liability under the
TCPA may extend beyond agents in certain circumstances. *See* DISH
Network, 28 FCC Rcd. at 6591. (noting Congress extended vicarious
liability of entities under 47 U.S.C. § 217 to any party acting
for common carriers or users) (quotation marks omitted).[12] The
language of 47 U.S.C. § 217 is "extremely broad" and has been
interpreted by the FCC as extending to independent contractors. In
Matter of Long Distance Direct, Inc., 15 FCC Rcd. 3297, 3300
(2000); *see also* Shamblin v. Obama for Am., 2014 WL 12610221, at
*3 (M.D. Fla. 2014) (section 217 provides a "broad definition of
responsible parties").

However, the case law is divided as to the mechanism by which
corporate officers are liable under the TCPA. Some courts view
section 217 as the source of liability. *See, e.g.,* Champion v.

---

[12] The Court notes that the term "user" is not clearly defined by the statute.
*See* DISH Network, 28 FCC Rcd. at 6594 n.126 ("we have been presented with no
authoritative precedent on the meaning of 'user'"). Further, although "common
carrier" is defined in section 153 of the TCPA, the definition is of little use
in the context of vicarious liability litigation. *See* Charvat v. EchoStar
Satellite, LLC, 630 F.3d 459, 465 (6th Cir. 2010) (remarking on the ambiguous
and undefined meaning of both "user" and "common carrier" in section 217 and
noting that the FCC has to develop the meaning of "common carrier" through a
"case-by-case adjudication").

Credit Pros. Int'l Corp., 2022 WL 3152657, at *3 (D.N.J. 2022)
(quoting City Select Auto Sales Inc. v. David Randall Assocs., 855
F.3d 154, 162 (3d Cir. 2018)) ("The Third Circuit has interpreted
[section 217] to mean[] a corporate officer can be personally
liable if he actually committed the conduct that violated the TCPA,
and/or [he] actively oversaw and directed this conduct.");
Appelbaum v. Rickenbacker Grp., Inc., 2013 WL 12121104, at *3 (S.D.
Fla. 2013) ("the plain language of [section] 217 seems to suggest
personal liability"). *Contra* Charvat, 630 F.3d at 465 (remarking
section 217 is only applicable to common carriers or users);
Hammann v. 1-800 IDEAS.COM, Inc., 455 F. Supp. 2d 942, 969 (D.
Minn. 2006) (precluding liability of individual corporate officers
under section 217). Other courts take the view that liability for
corporate officers is established by other provisions of the TCPA,
particularly section 227. *See* Spurlark v. Dimension Serv. Corp.,
2022 WL 2528098, at *5 (S.D. Ohio 2022) ("[T]he 'any person'
language in § 227 of the TCPA applies to individuals, including
corporate officers.") (citations omitted). Regardless of how
liability attaches, it is nevertheless the "prevailing view that
personal liability may extend to corporate officers under the
TCPA." Appelbaum, 2013 WL 12121104, at *3 (S.D. Fla. 2013).

Officers who violate the TCPA **while acting in the scope of
their employment** may be personally liable. Alvord v. QuickFi Cap.

Inc., 2019 WL 5788572, at *3 (D.  Utah 2019). To incur individual
liability even while acting on behalf of the corporation, corporate
officers must have "directly participated in or authorized the
statutory violation . . . ." Texas v. Am. Blastfax, Inc., 167 F.
Supp. 2d 892, 897 (W.D. Tex. 2001). Additionally, there must be at
least "[s]ome showing of intentional misconduct or gross failures
to implement policies that comply" with the TCPA. Mais v. Gulf
Coast Collection Bureau, Inc., 2013 WL 1283885, at *4 n.1 (S.D.
Fla. 2013).

In this case, Plaintiff argues for Defendant's liability on
the basis that Pierce was heavily involved in placing the violative
call. (Docket No. 170 at 15). Plaintiff does not allege, however,
that Pierce was a corporate officer or employee of the Campaign.
There is also no evidence in the record to suggest that the same.
Because Plaintiff has not put forth any evidence in the record
that Defendant was an officer or employee of the Campaign, summary
judgment is **GRANTED** on this theory of liability.

iv.  Alter Ego Liability

Plaintiff stated that he is no longer pursuing an alter ego
theory of liability. (Docket No. 170 at 19 n.5). Accordingly, the
motion for summary judgment on this theory of liability is **GRANTED**.

## VI.  CONCLUSION

For the foregoing reasons, the Court finds and ORDERS that the Defendant Brock Pierce's *Motion for Summary Judgment* is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of September 2023.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE